UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 14-20323-CR-ALTONAGA

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

BARRY KAPLOWITZ, CHRISTOPHER
GABEL, *et al.*,

    Defendants.

_____/

## ORDER

Following evidentiary hearings held on May 13, 2014, Magistrate Judge Patrick A. White

entered Detention Orders [ECF Nos. 42 & 43], finding Defendants Christopher Gabel ("Gabel")

and Barry Kaplowitz ("Kaplowitz"), posed a risk of flight and no condition or combination of

conditions would reasonably assure their appearances in court if they were released prior to trial.

To be clear, the Government did not seek Defendants' pre-trial detention, but it supports the

Detention Orders.  Gabel filed his Motion for Revocation and Appeal of Pre-Trial Detention

Order ("Gabel's Motion") [ECF No. 25]) on May 14, 2014, and Kaplowitz similarly filed a

Motion for Revocation of Pre-Trial Detention Order ("Kaplowitz's Motion") [ECF No. 38] on

May 16, 2014.  The Court held a hearing on the Motions on May 20, 2014 and has carefully

considered the parties' oral and written submissions.  For the reasons explained below, the

Motions are granted.

The Bail Reform Act of 1984, 18 U.S.C. sections 3141, *et seq.*, sets forth the principles of

law courts follow in determining whether to release or detain defendants pending trial.  *United

States v. Giordano*, 370 F. Supp. 2d 1256, 1258-59 (S.D. Fla. 2005).  Pursuant to 18 U.S.C.

CASE NO:  14-20323-CR-ALTONAGA

section 3142(e)(1), a defendant may be detained pending trial if "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  In determining whether detention of a defendant pending trial is appropriate, the court must consider: (1) the nature and circumstances of the offenses charged, (2) the weight of the evidence against the defendant, (3) the history and characteristics of the defendant, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.  *See id.* §§ 3142(g)(1)–(4).

As stated, Judge White detained Defendants solely on the ground they present a risk of flight pursuant to section 3142(f)(2)(A).  On appeal of a denial of requested pre-trial detention, review is *de novo*, with purely factual findings reviewed for clear error, and the district court permitted to receive additional evidence.  *See United States v. Hurtado*, 779 F.2d 1467, 1471 (11th Cir. 1985); *United States v. King*, 849 F.2d 485, 490 (11th Cir. 1988).  A finding of risk of flight must be supported by a preponderance of the evidence, while a finding that a defendant poses a danger to the community must be supported by clear and convincing evidence.  *See* 18 U.S.C. § 3142(f)(2)(B); *United States v. Quartermaine*, 913 F.2d 910, 917 (11th Cir. 1990).

The Court makes the following findings with regard to the four statutory factors, based on the record as a whole, including the additional evidence presented by the parties at the hearing on May 20.

### 1.     Nature and Circumstances of the Offenses Charged

Defendants are charged with one count of conspiracy to commit health care fraud and wire fraud in violation of 18 U.S.C. section 1349, two counts of wire fraud in violation of 18 U.S.C. section 1343, and two counts of health care fraud in violation of 18 U.S.C. section 1347.

2

CASE NO:  14-20323-CR-ALTONAGA

(*See* Indictment [ECF No. 3]).  Gabel is separately charged with conspiracy to defraud the United States and pay and receive health care kickbacks in violation of 18 U.S.C. section 371, and two counts of paying kickbacks in connection with a federal health care benefit plan in violation of 42 U.S.C. section 1320a-7(b)(2)(A).  (*See id.*).  Kaplowitz is charged with making false statements relating to health care matters in violation of 18 U.S.C. section 1035.  (*See id.*). Gabel's statutory maximum sentence is 95 years' imprisonment, with an advisory guideline range of life (meaning Gabel faces a guideline sentence of 95 years).  (*See* Gov't's Response 2 [ECF No. 48]).  Kaplowitz's statutory maximum sentence is 85 years' imprisonment, and his advisory guideline range is life (i.e., a guideline sentence of 85 years).  (*See* Gov't's Response 2 [ECF No. 49]).

The Indictment describes a scheme by Defendants to defraud the Medicare program through their activities at Hollywood Pavilion, LLC ("HP"), a purported psychiatric hospital in Hollywood, Florida.  HP operated an inpatient psychiatric hospital, and a second HP facility provided outpatient mental health "services."  The scheme is alleged to have taken place between the years 2003 and 2012.  The scheme resulted in over $67 million in false and fraudulent claims being submitted to Medicare.

For almost a decade, Gabel was the Chief Operating Officer of HP.  He reported directly to Karen Kallen-Zury ("Kallen-Zury"), owner of HP and architect of the fraud.  He allegedly negotiated the payment of bribes and kickbacks to obtain Medicare patients who did not qualify for inpatient or outpatient treatment.  He allegedly instructed others to create bogus documents to conceal the bribery scheme and mislead investigators.  After the Government's investigation into the activities at HP became public, Gabel allegedly instructed a patient broker to create several

3

CASE NO:  14-20323-CR-ALTONAGA

months' worth of false invoices in an attempt to cover up the bribes and kickbacks he and others at HP had arranged to be paid to that patient broker.  He instructed the patient broker to fax the false invoices to HP but to back-date the fax machine to make it appear as if the invoices had been submitted on the dates listed on the invoices.

Kaplowitz, a medical doctor, served as Medical Director of HP's outpatient facility between the years 2008 and 2011.  He allegedly caused the submission of over $7.5 million in false and fraudulent outpatient claims to Medicare through HP.  From the time Kaplowitz allegedly joined the conspiracy to the time it ended in September 2012, HP submitted approximately $26 million in false and fraudulent claims to Medicare.  Kaplowitz's role allegedly was to sign patient files for patients he never saw — patients who did not qualify for outpatient services.  He allegedly came to the facility about once a week and signed stacks of patient files pre-tabbed for his signature for patients he never admitted nor saw, signed blank treatment plans filled out by others, and signed documents in patient files authorizing the treatment of patients on dates he was not even physically in the United States.  Patient brokers sent a large number of Medicare beneficiaries to HP from drug and alcohol detoxification centers, and HP never provided them with any treatment — be it for substance abuse or mental health.

Defendants' is not the first Indictment returned by a grand jury for the activities that took place at HP for almost a decade.  On October 2, 2012, Kallen-Zury and four others were charged by indictment with participating in this scheme in *United States v. Kallen-Zury, et al.*, 12-20757-Cr-Martinez.  Following a jury trial, on June 28, 2013, Kallen-Zury and three others were found guilty.  (*See id.* [ECF No. 392]).  One of the charged defendants entered into a plea agreement

4

CASE NO:  14-20323-CR-ALTONAGA

and testified for the Government at trial.  She is cooperating with the Government in this case. Kallen-Zury has been sentenced to 25 years' imprisonment, and the others have received sentences ranging from 12 to 15 years' imprisonment.

The offenses Defendants are charged with, consisting of the theft of millions of dollars in Medicare funds — accompanied by Gabel's payment of bribes and kickbacks over a near ten-year period and Kaplowitz's activities as a medical doctor in falsifying medical records to enable a multi-million dollar Medicare conspiracy to operate — are extremely serious.  If convicted, Defendants, the sixty-year old Gabel and fifty-four year old Kaplowitz, face extremely long prison sentences.  As noted by the Government, given their ages, the offenses charged, and likely advisory guideline ranges, Defendants face the real possibility of spending the majority of the remainder of their lives in prison.

### 2.    The Weight of the Evidence Against the Defendants

The Government has already proved the HP conspiracy before a jury in this District and has the services of a cooperating defendant who testified at the first trial and is prepared to testify at Defendants' trial.  That defendant ran HP's outpatient facility.  During the first trial, Defendants' names were frequently mentioned, and they were described as key players in the fraud committed at HP.  The witnesses who testified at the first trial are expected to testify against Defendants in their trial in this case.  The weight of the evidence against Defendants appears strong.

### 3.    History and Characteristics of the Defendants

Before the Indictment was returned charging Gabel with committing the serious felony offenses described, Gabel had never been charged with a crime.  For approximately ten years,

5

CASE NO:  14-20323-CR-ALTONAGA

however, Gabel allegedly daily supervised medical professionals who were falsifying records and admitting persons in need of substance abuse treatment for mental health services they did not need or receive.   He allegedly participated in paying bribes and kickbacks to patient recruiters, all with the goal of submitting fraudulent billings to Medicare, knowing Medicare was in fact paying for the non-existent services.   During this time, Gabel resided in South Florida with his partner, his 90-year old mother lives in a rehabilitation center in Davie, and his brother lives in Port St. Lucie.

Gabel's net worth is approximately $300,000, he owns two South Florida homes with his partner, and he has no ties to foreign countries.  Despite his awareness of the related case against Kallen-Zury and others, as well as the large sums of money allegedly improperly billed and collected from a federal health care program through the scheme he allegedly directed, he took a Caribbean cruise in 2012.  He did return to this jurisdiction following the cruise and voluntarily surrendered to the FBI.  He has no ties to any foreign countries, nor does he have assets abroad.

Before his arrest on this Indictment, Kaplowitz similarly had never been charged with a crime.  But he allegedly participated in serious criminal activities every day between 2008 and 2011 each time he facilitated, as Medical Director, HP's submission of false claims to Medicare. Unlike Gabel, Kaplowitz has extensive foreign travel and foreign travel he did not disclose to Pretrial Services, including travel outside the United States at least thirteen times over the last ten years, and travel he engaged in on dates falsely appearing in patient files as though he were present in the country supervising patient care.

Kaplowitz owns a residence valued at $1.4 million with a $538,000 mortgage, and he owns two other residences in Florida, although he cannot recall their market value.  Kaplowitz

CASE NO:  14-20323-CR-ALTONAGA

has an art collection valued at approximately $300,000, and he has accounts at Chase Bank with approximate total balances of $47,000.  Kaplowitz, who has no children, has resided alone for the past 15 years, but his long-time partner testified about Kaplowitz's strong bond to his extended family.

Defendants' history and characteristics present a combination of factors that both support and militate against release.  While both have strong ties to South Florida, both are possessed of sufficient assets and motivation to flee to avoid serving long prison sentences if convicted for conduct they engaged in over a protracted period of time.  Both are educated men who, notwithstanding their ages and life experiences, allegedly took risks for the lengthy time periods described in participating in a sophisticated fraud scheme that endangered the lives of patients and endangered the viability of the country's Medicare program.

>   **4.    The Nature and Seriousness of the Danger to Any Person That Would be Posed by Defendants' Release.**

"The term 'dangerousness,' as used in the Bail Reform Act of 1984, has a much broader construction than might be commonly understood in everyday parlance."  *United States v. King*, 849 F.2d 485, 487 n.2 (11th Cir. 1988).  The concern about the "safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community." *Id.*  In other words, "concern about safety" should "be given a broader construction than merely danger of harm involving physical violence."  *Id.*

Under both interpretations of what dangers a court should consider as likely in the event a defendant is released, and contrary to the Government's suggestion in its briefing and arguments, the Court is satisfied Defendants' release poses no danger to any person or community. Defendants are hardly likely to consider, let alone engage in, any criminal acts while they await

7

CASE NO:  14-20323-CR-ALTONAGA

trial.

\*          \*          \*

Several well-established legal principles compel Defendants' release on a combination of conditions that will assure their presence at trial.  "The Bail Reform Act carefully limits the circumstances under which detention may be sought to the most serious of crimes."  *United States v. Salerno*, 481 U.S. 739, 747 (1987) (citing 18 U.S.C. § 3142(f)).  The policy of the Act "is to permit release under the least restrictive condition[s] compatible with assuring the future appearance of the defendant[s]."  *United States v. Price*, 773 F.2d 1526, 1528 (11th Cir. 1985) (alterations added).  Thus, "[o]nly in rare circumstances should release be denied," and [d]oubts regarding the propriety of release should be resolved in favor of" defendants.  *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985) (alterations added; citations omitted).

The Court's summary of the evidence proffered shows the first two factors — the nature and circumstances of the offenses and weight of the evidence — strongly favor the Government. The weight to be accorded the statutory factors certainly rests in the Court's discretion.  *See United States v. Gentry*, 455 F. Supp. 2d 1018, 1020 (D. Az. 2006) (citation omitted).  These two statutory factors are not the most significant in showing Defendants pose a risk of fleeing.  *See, e.g., Motamedi*, 767 F.2d at 1408 ("[T]he weight of the evidence is the least important of the various factors" as "the statute neither requires nor permits a pretrial determination that the person is guilty.") (alteration added; internal citations omitted).  "In . . . cases concerning risk of flight, . . . more than evidence of the commission of a serious crime and the fact of a potentially long sentence [are necessary] to support a finding of risk of flight."  *United States v. Friedman*, 837 F.2d 48, 50 (2d Cir. 1988) (alterations added); *see also Giordano*, 370 F. Supp. 2d at 1264

8

CASE NO:  14-20323-CR-ALTONAGA

(citing *Friedman*, 837 F.2d at 49).

With regard to the Defendants' history and characteristics, apart from their years'-long alleged commission of the crimes charged in this case, both men have never been charged with the commission of crimes, both have ties to partners and extended family members in this community, and neither has any foreign assets or connections to other countries where they might flee to and hide prior to trial.  Neither one has ever used an alias, attempted to avoid arrest, or hidden assets.  *See Giordano*, 370 F. Supp. 2d at 1264.  As noted by the court in *Giordano*, "[i]n economic fraud cases, it is particularly important that the government proffer more than the fact of a serious economic crime that generated great sums of ill-gotten gains.  Merely having access to significant funds is not enough; evidence of strong foreign family or business ties is necessary to detain a defendant . . . ." *Id.*

The Court has already rejected the suggestion Defendants pose a danger to anyone or the community if released while awaiting trial.  The thought they might engage in the commission of economic or other crimes to the detriment of the community while this case is pending is based solely on speculation.  Even if such speculation were indulged in, conditions of release may certainly be fashioned to guard against this possibility.

At best, the facts illustrate "[a] mere theoretical opportunity for flight" by these Defendants, which is an insufficient ground for pretrial detention.  *Id.* at 1264 (alteration added; citation omitted).  Accordingly, and after a careful consideration of the factors in 18 U.S.C. section 3142(g), the Court does not agree with the Detention Orders' conclusion that no combination of conditions will reasonably assure Defendants' appearances at future proceedings. For these reasons it is

CASE NO:  14-20323-CR-ALTONAGA

**ORDERED AND ADJUDGED** that the Motions **[ECF Nos. 25 and 38]** are **GRANTED**.  Defendants are ordered released upon satisfying the following conditions:

1.      Defendants shall each post a $1 million 10% bond with Nebbia, with a $2 million personal surety bond cosigned by Eric Ohff for Gabel, and cosigned by Mara Blitz (or her husband) and Arthur Kaplowitz for Kaplowitz.

2.      Defendants shall surrender their U.S. passports to Pretrial Services, they may not obtain any new travel documents during the pendency of this case, and they may not leave the Southern District of Florida absent permission granted by the Court.

3.      Defendants must refrain from employment in the health care field.

4.      Defendants must report to Pretrial Services as directed.

5.      Defendants' property and their co-signers' properties (if any) may not be encumbered during the pendency of this case.

6.      Kaplowitz shall participate in the home confinement program — 24 hours' home detention — with allowances to leave his residence for medical, court appearances, and attorney visits as monitored by U.S. Probation.  All costs of electronic monitoring shall be paid by Kaplowitz.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 22nd day of May, 2014.

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record

10